Merrimack
No. 85-131
No. 86-387

# The State of New Hampshire

v.

# Robert Bruneau

December 9, 1988

*Stephen E. Merrill*, attorney general (*Brian T. Tucker*, associate attorney general, on the brief and orally), for the State.

*James E. Duggan,* chief appellate defender, of Concord, on the brief and orally, for the defendant.

SOUTER, J. The defendant stands convicted of first degree murder, RSA 630:1-a, I(a), and appeals on four assignments of trial and post-trial error by the Superior Court (*Cann,* J.): (a) in admitting the defendant's inculpatory statements to an informer, over the objection that receipt of the informer's testimony violated State and federal rights to counsel; (b) in ruling that other statements of the defendant, concededly obtained in derogation of State and federal rights to counsel, could be used to impeach him if he took the stand; (c) in refusing to give proffered jury instructions on the significance of flight by an individual who the defendant claimed had committed the murder; and (d) in refusing to authorize public funds for a post-conviction deposition of that same individual. We affirm.

On March 8, 1984, the defendant, Robert Bruneau, went to the house of one Baranski, in Manchester, where he met two associates, Asselin and Mathieu, with whom he planned to travel to Florida. The defendant asked the others to postpone their departure by one day, to give him time to speak with his estranged wife, Emma Waters, before he left. The defendant was then under indictment in Maine for kidnapping Waters, and he had previously boasted that he would kill her unless she desisted from her intention to testify against him. On the afternoon of March 9, the three men drove to Concord where, at length, Asselin and Mathieu observed the defendant approach Waters in a New Hampshire Hospital parking lot and thereafter drive out of the lot in a car with a woman. Asselin and Mathieu then left for Florida without the defendant.

Early that evening, the defendant walked to a house on the outskirts of Concord, from which he called Baranski. Baranski drove to Concord to pick the defendant up, and on the way back to Baranski's house the defendant said, "I just got done killing my wife. I only shot her in the head once." He then took out a handgun and replaced an empty shell with a live round. At Baranski's house, the defendant retrieved his own car and left for Florida in pursuit of Asselin and Mathieu. That same evening Waters's car was seen parked about a half mile from the house at which the defendant had made his call, and the following morning her body was found beside the car, with a single gunshot wound in the head.

Later on March 10, the defendant ran into Asselin and Mathieu in a rest area in North or South Carolina. They noticed he was carrying a gun under his belt, and he told them he had killed his wife. Although the defendant wished to join the other two at that point, they persuaded him to plan a rendezvous at a spot further south. Asselin and Mathieu failed to stop there, however, but drove straight to Daytona, Florida.

Soon after they arrived, they were again reminded of the defendant's persistence in seeking their company, when a police officer stopped them as they were about to enter their van and told them that a friend of theirs named Bob had asked the police to tell them he was waiting at the Salvation Army building. Instead of going there, however, Asselin and Mathieu made calls to Baranski and to the police in Concord, New Hampshire, to find out whether Waters had, in fact, been killed. When they found she had been, they told what they knew about the killing to the Daytona police, who relayed the information to Concord.

Baranski, too, spoke with the authorities after verifying that Waters had been killed as the defendant had said. He first called the State police, who passed his inquiry on to the Concord Police Department. Investigators from Concord then called on Baranski and took his statement

In due course, the defendant was charged with homicide and arrested, and while in custody awaiting return to New Hampshire he made several telephone calls to Baranski. On March 11, during an interview with Concord police, Baranski told them the defendant had called and would probably call him collect again. When he asked what he should do, the police told him the expense of any long distance collect calls would be his and that he should accept or refuse them as he saw fit. Baranski told the police he would accept the calls, and thereafter informed them that the defendant had asked him if he knew anyone who "could take care of" Asselin and Mathieu, the former of whom the defendant had said he intended to blame for the murder.

As soon as the defendant had been returned to New Hampshire, members of the Concord Police Department spoke with him at the county jail where he was awaiting trial. The defendant's lawyer was not present, and the police elicited no constitutionally adequate waiver of the defendant's right to the presence of counsel before he agreed to speak with them. He did not confess to the murder, however, but purported to admit that he had merely assaulted his late wife. The trial court suppressed the use of this statement in the State's direct case, and although the court ruled further that

it could be used for impeachment, the defendant never took the stand, and the statement was never introduced.

Nor did Mathieu ever take the stand, for neither side could locate him in time. When Mathieu was arrested after the trial was over, the defendant sought but was denied public funds to pay for deposing him as a material witness. We consolidated the defendant's appeal from this denial with the issues raised in his appeal from the murder conviction, to which we now turn.

The defendant argues, first, that Baranski's testimony repeating incriminating statements made by the defendant in the course of telephone calls from Florida was received into evidence in derogation of the defendant's State and federal rights to the assistance of counsel. *See* N.H. CONST. pt. I, art. 15; U.S. CONST. amends. VI and XIV. We begin with the State claim. *See State v. Ball*, 124 N.H. 226, 232, 471 A.2d 347, 351 (1983).

There is no dispute that the defendant's article 15 right to the assistance of counsel had attached by virtue of the commencement of formal criminal proceedings, *cf. State v. Scarborough*, 124 N.H. 363, 367, 470 A.2d 909, 912 (1983). The State does not contest the proposition that the defendant was thereafter entitled to the assistance of counsel during any interrogation, in the admitted absence of any waiver of that right, *see State v. Elbert*, 125 N.H. 1, 9, 480 A.2d 854, 858 (1984). Nor does the State deny it is forbidden to employ third parties to conduct interrogations that would infringe the article 15 right to counsel if done directly by the police. *See State v. Tapply*, 124 N.H. 318, 325, 470 A.2d 900, 904 (1983) (right to counsel under State Constitution should be construed liberally.)

The point of disagreement occurs, however, at the defendant's assertion that the police in this case did indirectly through Baranski's agency what they concededly could not do directly, that the police used Baranski to gather evidence surreptitiously by circumventing the conceded limitations imposed by article 15 on the interrogation of a defendant whose right to counsel has vested. Specifically, the State denies two propositions: (1) that for purposes of applying article 15, Baranski can be viewed as having acted as the government's agent during his conversations with the defendant; and (2) that Baranski's part in those conversations, if attributed to the State, was interrogation forbidden under article 15 in the absence of counsel or waiver. In dealing with the issues thus raised, we must therefore apply both a concept of agency to determine when an ostensible third party functions as the equivalent of a

police officer and a concept of interrogation to identify the activity that implicates article 15 protection.

██ The definition of the agency relationship is a subject of first impression under the State Constitution, and we approach it with emphasis on the specific context in which it is to be employed. Since the defendant makes no claim that the government is subject to a *per se* disability to receive evidence obtained from a defendant after the right to counsel has attached, the object of an agency test must be to distinguish between permitted and forbidden processes employed in obtaining the evidence from the defendant. A conclusion that the government has engaged in the process through an agent, and has not merely received evidence already obtained, must therefore require proof of some affirmative action by a police officer or other governmental official that preceded the interrogation and can reasonably be seen to have induced the third party to conduct the interrogation that took place.

██ Two varieties of governmental action will qualify. Most obviously, the government's prior agreement with a third party that the latter should act to obtain evidence from a defendant will suffice as affirmative act and inducement. Such an agreement may merely authorize or sanction the third party's action, or it may take on the features of a private contract, with an agreed-upon *quid pro quo* for the third party's efforts or results. It may be expressed with precision on each side, or confirmed by a mere wink or nod. But however formal or informal the agreement may be, there will be some responsive communication between the parties, and the exchange will evince an understanding that the third party will be acting on the government's behalf or for the government's benefit.

██ Not all prior governmental inducement, however, may fall within the scope of agreements, understood as requiring responsive communication antecedent to third-party action. A prior governmental request for help may have the same effect, even though the third party who acts upon it may make no reply back to the government at the time. In these circumstances, just as in the familiar field of unilateral contract in the civil law, the third party may respond simply by taking the action that a government official has requested, while communicating nothing back to the government until some testimonial evidence or its fruits have been obtained from a defendant.

In each such instance, by agreeing or by merely requesting, the government will have acted in advance of any interrogation of a defendant, and will have acted in a way that may be understood

to have formed an inducement for the third party to engage in such questioning as later occurred. To be sure, the inducement may derive its force from any one of a wide variety of third-party interests: the good citizen may respond from a sense of civic obligation, while the common informer may be looking for prosecutorial leniency or even payment in cash. But in each such instance, the fact that the government asked the third party to obtain the evidence that the third party later supplies will be the sufficient and necessary ground for holding the government responsible as a principal for the interrogative activity of the third party as its agent.

The nature of the third party's activity that may thus qualify as interrogation for purposes of article fifteen does not present a subject of such original inquiry under State law. *See State v. Tapply*, 124 N.H. 318, 470 A.2d 900. By its very nature, interrogation is distinct from passivity, and its proof requires the demonstration of something more than an informer's mere willingness to listen to a defendant's imprudent disclosures. Accordingly, there must be evidence that the agent intentionally questioned a defendant, or induced him to make revelations, or established a relationship with him reasonably calculated to draw out incriminating disclosures. *See id.* at 322–25, 470 A.2d at 903–04. It is on such showings that a court may find those functional equivalents of interrogation that the police would be barred from conducting in the absence of counsel or a defendant's waiver.

Applying these concepts to the record at hand, we hold that adequate evidence sustains the trial court's finding that Baranski was not "working with law enforcement" as an agent, and indicates further that he engaged in no interrogation. The police did not, of course, go to Baranski in the first instance. It was, rather, Baranski who made the initial move by calling the State police, and when the Concord police spoke with him, they took no affirmative steps to enlist his help. While it seems generous to suggest, as the trial judge did, that Baranski may have acted from a sense of civic duty, the record demonstrates that the police made no agreement with him and requested no help from him. They made no appeal to the obligations of citizenship, they did not discuss the disposition of any criminal charges, they neither paid nor promised to pay money for information, and they made it clear that they would not even underwrite Baranski's toll charges for any of the defendant's collect calls.

The most, indeed, that the defendant can adduce in his efforts to prove an agency relationship are the facts that Baranski had acted as an informer in the past, that at the relevant time he was committing drug offenses that would ultimately subject him to criminal charges, and that after he had disclosed the first of the defendant's statements the police indicated that the information had value to them. But none of these facts is so connected as to give rise to the agency relationship we have described. The indication of the prior informing was not followed with evidence or an offer of proof that Baranski had previously informed for the Concord police, in which case there might have been some basis to inquire into the possibility of a continuing understanding that the police wished him to act for them in return for customary recompense. And all that can be inferred from the facts of Baranski's prior informing, coupled with his engagement in criminal activity even as he passed on information, is that Baranski had reason to hope that any help rendered to the police would redound to his benefit in the future. Hopes and motives, however, do not supply the element of agreement or request that agency requires. Finally, although indications from the police that information supplied has value to them could, in some contexts, be seen as tacit requests, no such inference was required by the trial court on the present record. All conversations occurred after the police had been emphatic that the decision to accept or reject calls from the defendant was Baranski's decision alone, and there is no evidence that the police did anything to indicate they really wanted Baranski to do what they were verbally telling him was entirely a matter for him to decide. *Cf. State v. Smith*, 107 Ariz. 100, 102–04, 482 P.2d 863, 865–67 (1971). In this context, the facts that the police acknowledged they were glad to have the information Baranski supplied, and called him once or twice to converse about any information he might have, need not have been viewed as crossing the line between readiness to receive and importunity to obtain.

Equally unproven on the record before us is the second requisite of a surreptitious violation of the State right to counsel, the agent's intentional behavior reasonably calculated to obtain incriminating evidence. The evidence discloses that the reticence of the police in dealing with Baranski had its analogue in Baranski's dealings with the defendant. It was the latter who called Baranski on each occasion, and there is no evidence that Baranski said or did anything to encourage incrimination. Apparently Baranski's closest approach to questioning was to ask the defendant innocuously, "how he was doing." Although the trial court made no finding on this

point, no fact-finder could have concluded that Baranski's behavior was the functional equivalent of interrogation.

Here it is well to mention that the defendant has raised a related issue about the scope of the defense's cross-examination of Baranski on his relationship with the police. The trial judge sustained objections to defense questions about Baranski's prior contacts with the police generally, although Baranski did testify that he had informed to some police agency in the past. The court also ruled out questions about Baranski's criminal behavior during the time he was receiving the defendant's calls. As it turned out, Baranski later testified before the jury that he had engaged in illegal drug activity during the period in question, but that he had not disclosed this to the police until a few days before trial.

■ There was no reversible error in these rulings. We agree with the trial judge that evidence merely about prior contact with unspecified police agencies was insufficiently focused on the relationship between Baranski and the Concord police at the time in question, and that evidence of Baranski's contemporaneous criminal activity, *per se*, could have done no more than reveal Baranski's reasons of self-interest to cultivate the good will of law enforcement. That is, the challenged questions were not tailored to call for answers that could have cast doubt on the trial court's finding that the defendant was not, as we would put it, acting as an agent of the police. In sum, no evidentiary error infects the trial court's finding that the State did not act through the person of Baranski to abridge the defendant's right to counsel under article 15.

■■ We look, now, to the defendant's parallel claim under the sixth and fourteenth amendments. Under the sixth amendment, there is no violation when "by luck or happenstance—the State obtains incriminating statements from the accused after the right to counsel has attached." *Maine v. Moulton*, 474 U.S. 159, 176 (1985). When the conduit for those statements is an informer, the relevant enquiry is, in language originating in *Massiah v. United States*, 377 U.S. 201 (1964), whether the informer was a State agent who "deliberately elicited" the statement in the absence of counsel, *id.* at 206, and without a valid waiver.

■ Cases in the courts of appeal have emphasized that agency status under the federal law entails a "substantial relationship" between the alleged agent and the police, *United States v. Lynch*, 800 F.2d 765, 769 (8th Cir. 1986), *cert. denied*, 479 U.S. 1094 and 481 U.S. 1022 (1987), in the nature of an "agreement," *Lightbourne*

*v. Dugger*, 829 F.2d 1012, 1020 (11th Cir. 1987), *cert. denied*, 109 S. Ct. 329 (1988), which is not inferable merely because the informant elicited evidence on the mere anticipation that he might later make some use of it for his own benefit, *United States v. Taylor*, 800 F.2d 1012, 1016 (10th Cir. 1986), *cert. denied*, 108 S. Ct. 123 (1987). Motives do not establish agency. *Lightbourne v. Dugger*, *supra* at 1021. "[Nor does] a defendant . . . make out a violation of [the sixth amendment] right simply by showing that an informant, either through prior arrangement or voluntarily, reported his incriminating statements to the police. Rather, the defendant must demonstrate that the police and their informant took some action, beyond merely listening, that was designed deliberately to elicit incriminating remarks." *Kuhlmann v. Wilson*, 477 U.S. 436, 459 (1986).

Given these standards, agency was as far from this case for sixth amendment purposes as it was for the purpose of article 15. There was no evidence of any agreement, tacit or otherwise, and the record shows nothing more than hope of some future benefit on Baranski's part.

■ Nor was there evidence that could have satisfied the test of deliberate elicitation. There was no indication that Baranski made efforts to stimulate conversation with the defendant, *see United States v. Henry*, 447 U.S. 264, 271 n.9 (1980); *Kuhlmann v. Wilson*, *supra* at 458, or otherwise engaged in the "equivalent of direct police interrogation." *Kuhlmann v. Wilson*, *supra* at 459. Baranski's essentially passive role in receiving the calls and listening to the defendant belie the claim that he deliberately elicited anything. For federal purposes, as well, then, the trial court rightly denied the motion to suppress Baranski's testimony about the defendant's incriminating statements on the telephone.

This conclusion does not, however, exhaust our present concern with the defendant's State and federal rights to counsel. The defendant's second issue on appeal rests on a claim that rights to counsel under article 15 and the sixth and fourteenth amendments were abridged by a trial court ruling that the State was not barred from impeaching the defendant with a statement he had given to the Concord police. After the defendant's arrest in Florida, he invoked his right to counsel under *Miranda* and did not thereafter initiate conversation with the police. *See Edwards v. Arizona*, 451 U.S. 477, 484–85 (1981). Upon his return to Concord, detectives from the Concord Police Department spoke with him and obtained an ostensible waiver of his *Miranda* rights, after which he made

an exculpatory statement denying that he had killed Waters, although admitting to a non-lethal assault.

By motion *in limine* filed before trial, the defendant sought to suppress the statement on authority of *"Edwards v. Arizona,* 451 U.S. 477 (1981); *State v. Beaupre,* 123 N.H. 155; *State v. Tapply,* 124 N.H. 318 (12/27/83)." The State conceded, and the trial court ruled, that the police had obtained the statement in violation of *Miranda,* since the defendant had previously invoked *Miranda* rights and had not initiated the conversation with the Concord police that led to his statement. *See Edwards v. Arizona supra.* His purported verbal waiver was therefore inadequate, and his uncounseled statement was inadmissible in the State's case in chief. *Edwards v. Arizona, supra* at 487. The trial court further ruled, however, that the State could use the statement to impeach the defendant if he took the stand, on the authority of *Harris v. New York,* 401 U.S. 222 (1971), holding such a result permissible under the fifth amendment.

In this appeal, the defendant seeks to challenge the trial court's ruling, not as a misapplication of *Miranda* or *Harris,* but as an abridgment of his right to counsel as arising independently of *Miranda* under article 15 and the sixth amendment, by virtue of the commencement of formal criminal proceedings against him. For two independent reasons, we hold the issue was not properly raised.

First, the defendant's motion *in limine* did not adequately inform the trial judge that the defendant based his claim on any other theory than the consequences of a *Miranda* violation. The citations to *Edwards, Beaupre* (a case applying *Edwards*), and *Tapply* (a State constitutional case involving the right to counsel during custodial interrogation before formal charges) all indicated that the defendant was concerned only with a *Miranda* violation and such post-*Miranda* State law rights as were considered in *Tapply.* Although it is true that the defendant's motion also asserted that post-indictment rights of counsel had attached, the claimed violation was described solely by reference to cases concerned with *Miranda,* not to cases dealing with post-indictment rights. Moreover, although it is clear that the trial judge's subsequent written order dealt only with the significance of the *Miranda* violation, by referring to *Edwards* and relying on *Harris,* the defendant apparently did nothing further to call the judge's attention to an additional claim under the sixth amendment or article 15. We hold, therefore, that no such additional theory of relief was adequately presented to the trial court. Since the ruling

was concededly correct insofar as it applied *Harris*, there is no issue for our consideration.

Second, assuming *arguendo* that the defendant raised an issue involving post-indictment State and federal rights to counsel, we find the claim of prejudicial error too speculative for adjudication. The defendant never testified and was never impeached. We have no way of knowing whether his decision to remain off the stand was influenced to any degree by the ruling *in limine*, any more than we can tell what would have happened if he had testified. We do not know whether his testimony would have differed from the substance of his statement, or whether the State would actually have used the statement to impeach him.

The record, indeed, is not only devoid of any basis to infer that the defendant was prejudiced, but it is in fact suggestive of just the opposite. It will be remembered that the statement was an exculpatory one, denying the killing. The defendant has never claimed that the statement was untrue, or that he would have told a different exculpatory story if he had taken the stand. There is, then, on balance, more reason to infer that the possibility of impeachment by use of the statement had nothing to do with the defendant's decision to remain silent, than there is to suggest otherwise.

In any event, because of the defendant's total inability to show any connection between the trial court's ruling, the defendant's decision, and any ensuing prejudice, we hold the *in limine* ruling inadequate to present an issue on appeal. Only if the defendant had taken the stand and suffered impeachment by the statement's use would an issue be ripe for adjudication here. *Accord State v. LaRose*, 127 N.H. 146, 150, 497 A.2d 1224, 1228 (1985) (no inquiry into possible prejudice from ruling allowing State to impeach by prior conviction where defendant does not take stand); *Luce v. United States*, 469 U.S. 38, 43 (1984).

Although we are mindful of two cases cited by the defendant as contrary authority, each is distinguishable, even with respect to the federal claims. In *Brooks v. Tennessee*, 406 U.S. 605 (1972), the defendant challenged a State statute requiring him to testify as his own first witness or remain off the stand entirely. At trial, he had attacked the statute's constitutionality by motion *in limine*; after an unfavorable ruling, he presented two witnesses but did not take the stand himself. While it is true that the Court reached the merits of his challenge even though the defendant never took the stand, it would have made no sense to insist that he do so. The essence of his claim was that he had a right to take the stand after

presenting his own witnesses, and the State rule in issue barred him from doing so under those circumstances. That is to say, the violation was claimed to be the statute's limitation on the defendant's right to structure his own case, not the production of prejudice from the defendant's possible treatment on the stand if he had chosen to testify at the point in his case when the statute allowed him to do so.

Nor do we find support for the defendant in *Portash v. New Jersey*, 440 U.S. 450 (1979). In that case, the trial court had ruled the defendant's legislatively immunized grand jury testimony admissible for impeachment, and he never took the stand. Although a majority of the court reached the merits of his appeal from that ruling, the majority opinion was premised, *inter alia*, on the observation that the highest State appellate court to have reviewed the case had considered the issue on its merits. Even so, Justice Powell, concurring for himself and one other, observed that the preferred procedure for challenging such a ruling calls for the defendant to take the stand, in order to present a concrete factual record and avoid artificial challenges by defendants with no real interest in testifying. *Id.* at 462. And Justice Blackmun wrote for himself and another justice in dissent, listing many of the considerations we have invoked above as support for his opinion that the issue was too remote and speculative for appellate adjudication. *Id.* at 467. We respectfully hold this to be the sound view.

Although the defendant did not take the stand, he did not limit his defense to a plea of not guilty, coupled with reliance on the State's burden of proof. Consistently with Baranski's report of one of his telephone conversations with the defendant, defense counsel managed to put forward the view that Mathieu had murdered Waters and that Asselin was lying to cover for him. In support of this position, counsel urged the jury to consider that Asselin and Mathieu disappeared after calling and speaking with the police on March 12, 1984, noting that Asselin had been found again only after an arrest in Maine on charges unrelated to this case, and that Mathieu was still missing at the time of trial.

The defense argued that Asselin's and Mathieu's behavior should be evaluated under the rule sometimes applied to a defendant's conduct, that post-offense flight may be seen as indicating consciousness of guilt, *see State v. Cassell*, 129 N.H. 22, 23, 523 A.2d 40, 41 (1986). Counsel consequently requested the following instructions be given to the jury:

"You have heard evidence that Roger Asselin and Claude Mathieu failed to keep commitments to meet with the investigating officers in this case and otherwise rendered themselves unavailable to officers who had requested their assistance and cooperation throughout the course of the investigation. From this evidence you may conclude that they were conscious of their own guilt."

". . . Of course, you should consider all the evidence in the case, direct and circumstantial, in order to decide whether the State has proven the defendant guilty beyond a reasonable doubt, including any evidence of flight or other efforts by Claude Mathieu and Roger Asselin to avoid contact with the police or prosecuting authorities."

The trial judge's denial of each request is claimed to have been an erroneous refusal to instruct the jury on the theory of defense. *See State v. Aubert*, 120 N.H. 634, 635, 421 A.2d 124, 125 (1980).

As to denial of the first request, nothing need be said beyond noting that it refers to action far more equivocal than the classic examples of fugitive behavior that are customarily thought to justify an instruction on the significance of flight. *See* 2 WIGMORE, EVIDENCE § 276 (Chadbourne rev. ed. 1979) (flight, escape from custody, resistance to arrest, concealment, assumption of false name). As to the second, we will assume *arguendo* that the elusive behavior of the two witnesses would qualify as flight, and that there would have been no error as a matter of law to instruct the jury that in evaluating a witness's behavior it might consider flight (though not "other efforts"). It does not follow, however, that the court's refusal thus to charge the jury was itself an error.

■■ While it is, of course, true that a trial judge is bound to instruct the jury on a defendant's "theory of defense," if there is an evidentiary basis to support it, *State v. Aubert supra*, our law distinguishes a "theory of defense" from what is called a "theory of the case," *State v. Guaraldi*, 124 N.H. 93, 97, 467 A.2d 233, 235–36 (1983). The latter is simply the defendant's position on how the evidence should be evaluated and interpreted, *id.*, whereas a "theory of defense" has been described as akin to a civil plea of confession and avoidance, by which the defendant "admits the substance of the allegation but points to facts that excuse, exonerate or justify his actions such that he thereby escapes liability." *State v. Guaraldi*, *supra* at 97, 467 A.2d at 235. That is, a theory of defense is a proposition about the legal significance of claimed facts, and it thus falls within the scope of a judge's responsibility

to instruct the jury on the law. *See State v. Bird*, 122 N.H. 10, 15, 440 A.2d 441, 443 (1982).

As the term is so understood, the defendant advanced no theory of defense, but simply made a factual argument that tended to indicate someone else was guilty. The defendant was not, therefore, entitled under *Aubert* to an instruction elucidating such a position, which may or may not be mentioned in the course of the charge as a matter of judicial discretion. *See State v. Shannon*, 125 N.H. 653, 662, 484 A.2d 1164, 1172 (1984). Since one cannot say that the jury was incapable of following and evaluating the defendant's argument in the absence of an instruction that flight in some circumstances can be taken to express consciousness of guilt, it was no abuse of discretion to decline to give the charge as requested. Indeed, the more specifically a jury charge adverts to the evaluation of particular items of evidence, the greater the risk of its becoming argumentative. The trial court preferred brevity to risk and left the argument to defense counsel.

Although that argument found no favor with the jury, the defendant made one further effort to find some exculpatory value in Mathieu, when the latter turned up after trial. The defendant moved for an order to detain Mathieu as a material witness under RSA 597:22 and requested an authorization of funds under RSA 604-A:6 to pay for the cost of his deposition. The trial court first denied the motion on jurisdictional grounds, and later affirmed its order after an evidentiary hearing and reconsideration on the merits. Mathieu testified at the hearing, after which the court found that if his testimony had been presented at trial it "would have been merely cumulative *against* the interests of defendant." (Emphasis in original transcript.)

The defendant nonetheless still wishes to press forward with Mathieu's deposition, and he argues here that he was entitled to take it as a matter of statutory right under RSA 517:13. Because he further reasons that a defendant with private funds at his disposal would have met no obstacle in deposing the witness, he concludes that the court's refusal to authorize public funds for this purpose denied him State and federal due process and equal protection. Thus, the defendant's entire argument depends on whether RSA 517:13 entitles him to take the deposition as a matter of right. It does not, and the defendant's position falls accordingly.

RSA 517:13 has been amended since the defendant filed his motion in 1985, *see* RSA 517:13 (Supp. 1988), although the amendments would not affect the following analysis. The version of the statute on the books at the time of the motion provided that

"[t]he respondent in a criminal case may take the deposition of any person in his defense, upon giving the same notice of the caption thereof to the county attorney that is required to be given to the adverse party in a civil case. Any deposition so taken may be used on the trial of the case whenever, in the discretion of the court, the use thereof shall be deemed necessary for the promotion of justice."

As it has appeared in prior statutory compilations, that section has been held to be inapplicable prior to indictment in a felony case, *State v. Nord*, 73 N.H. 531, 63 A. 673 (1906), and prior to arraignment and plea on a misdemeanor charge, *State v. Myal*, 104 N.H. 188, 182 A.2d 605 (1962). In the latter case, the court reasoned that "[u]ntil there is a plea, there is no issue to be tried and there can be no valid conviction nor sentence imposed upon the defendant." *Id.* at 189, 182 A.2d at 606. Thus, it is the existence of an issue to be tried that conditions the defendant's statutory opportunity to depose a witness, a rationale that is, indeed, strongly suggested by the statutory language that a deposition "so taken may be used on the trial of the case" in the court's discretion.

■ When, however, a criminal trial has been concluded by a guilty verdict and sentence, and there is no longer an issue to be tried, the statute's applicability appears to be at an end. The only bases upon which any further trial might then be anticipated would be the assumption that reversible error had occurred in the trial just concluded, or the assumption that newly discovered evidence would entitle the defendant to a new trial. There is, however, a presumption against each, in the sense that a defendant carries the burden to demonstrate reversible error, *State v. Foster*, 80 N.H. 1, 6, 113 A. 211, 214 (1921), or other entitlement to a new trial, *State v. Abbott*, 127 N.H. 444, 450, 503 A.2d 791, 795 (1985). We therefore hold that statute is no longer applicable at the conclusion of a criminal trial unfavorable to the defendant.

We have no occasion here to rule on the jurisdiction of a trial court under these circumstances to order a post-trial deposition for good cause under its inherent authority over discovery. *See State v. Heath*, 129 N.H. 102, 109, 523 A.2d 82, 87 (1986). It is enough to note here that any claim of such good cause evaporated with Mathieu's testimony at the hearing and the court's findings that Mathieu's evidence would have enhanced the prosecution's case.

*Affirmed.*

All concurred.