Rockingham
No. 2000-139

THE STATE OF NEW HAMPSHIRE

v.

JOSEPH HEIRTZLER

December 24, 2001

*Philip T. McLaughlin,* attorney general (*Ann M. Rice,* senior assistant attorney general, on the brief and orally), for the State.

*Richard E. Samdperil,* assistant appellate defender, of Concord, by brief and orally, for the defendant.

BRODERICK, J. The defendant, Joseph Heirtzler, was charged with possession and distribution of a controlled drug. *See* RSA 318-B:26 (I)(b)(3), (II)(a) (Supp. 2000). The State appeals an order of the Superior Court (*Coffey,* J.) granting his motion to suppress evidence obtained as a result of an interrogation and search conducted by a school official. We affirm.

The record supports the following facts. Londonderry Police Officer Michael Bennette was assigned as the school resource officer for Londonderry High School (school). One reason for Bennette's assignment was the Londonderry Police Department's (department) perception that the school was investigating criminal matters, which should have been reported to and handled by the department. As the school resource officer, Bennette remained under the direct control and supervision of the department, and his job essentially was to investigate criminal activity on school grounds. The department's policy was to investigate reports of criminal activity at the school in the same manner as other criminal complaints.

Prior to assuming his assignment at the school, Bennette met with school officials to discuss the parameters of his job. He made clear that cases were to be reported and prosecuted, not "whitewashed" by school officials. Bennette told school officials to contact him when cases involved criminal activity or required criminal investigation. They agreed, but asserted that administrative and disciplinary matters involving students fell within the sole authority and control of the school. According to Bennette, the school principal was keenly aware of the difference between administrative duties and law enforcement within the school.

Because of the number of searches conducted at the school under its search policy, Bennette could not handle the investigation of every potential criminal matter. The school, therefore, agreed to investigate the less serious potential criminal matters, including searches. Indeed, at the suppression hearing, assistant principal James O'Neill testified as follows:

> Q: But I guess when Officer Bennett [sic] and you worked out what the parameters of his job . . .
> A: Yes.
> Q: . . . this would be acceptable to the school, because you had to agree to let him come, right?
> A: Let him come into the building? Yes.
> Q: So part of that agreement was a lot of those potential criminal matters you would handle, and some of the more serious criminal matters they would handle?
> A: That's fair.

Bennette's testimony regarding this agreement was as follows:

> Q: Drug investigation. Do you recall me asking you: "Is it fair to say that, in your mind at least, you delegated some of the responsibility of investigating these cases to the school administration?"
> Your answer is, "Yeah," right?
> A: Yes.

This delegation of responsibility, according to Bennette, would occur at his direction after he assessed the information brought to his attention to determine "what level it [rose] to." Bennette stated at his deposition that if the safety level and threat were high, such as in cases involving a report that a student possessed a knife or gun, he would conduct the investigation and any necessary search. If the information involved drugs, however, he would pass it along to school officials for action. Essentially, if Bennette lacked probable cause to pursue a less serious criminal matter and perhaps make an arrest, he would deem it a school issue and turn the information

over to school officials. Once he turned the information over, he had no further involvement unless the school requested it. He testified, however, that when officials seized contraband from a student they would contact him.

Bennette conceded that a "silent understanding" existed between him and school officials that passing information to the school when he could not act was a technique used to gather evidence otherwise inaccessible to him due to constitutional restraints. At his deposition, Bennette stated:

Q: I mean, isn't it fair to say that it is a technique that is used that when you have some information, but it is not enough under the existing case law to permit you to do a search, that one of the techniques you would have utilized, or did utilize was to pass it on to the school, because you know they don't need all the probable cause that you need in order to act?

A: I know that, and I know that going in, the first day of school. And [school officials] know it themselves too. . . .

Q: But isn't it fair to say that there is sort of a silent understanding that when you pass on this type of information . . . .

A: Well, I think we both know, you know and I know it, and so does the school administration . . . .

At the time of his arrest for possession and distribution of a controlled drug, the defendant was a student at the school. During science class, his teacher observed him pass what appeared to be a folded piece of tinfoil to another student. The student removed something from the tinfoil, put it in a piece of cellophane and passed the folded tinfoil back to the defendant. After class ended, the teacher contacted Bennette and told him what she had observed. Bennette testified that although he may have had articulable suspicion to investigate further, he ultimately decided that he did not have enough information to warrant further investigation. Instead, Bennette passed the information to O'Neill for action.

After receiving the information from Bennette, O'Neill told him that the matter was a school administrative issue. O'Neill testified that although the situation could involve drugs or illegal substances, since it did not involve criminal activity of a more serious nature, it was the school's administrative duty to act upon the information. O'Neill and another assistant principal, Robert Shaps, called the defendant to the office, questioned him and asked if they could search him. The defendant complied with the search request and a piece of paper wrapped in tinfoil was found in his cigarette pack. After further questioning, the defendant stated that the piece of paper might be LSD. Once the search produced the

potential presence of an illegal drug, O'Neill contacted Bennette and turned the matter over to him.

In his motion to suppress, the defendant argued that O'Neill and Shaps were acting as agents of the police and thus their interrogation and search had to conform with the procedural safeguards afforded criminal suspects when the State acts. Alternatively, the defendant argued that even if O'Neill and Shaps were not acting as agents of the State, they lacked reasonable grounds to interrogate and search him.

Relying upon *State v. Bruneau*, 131 N.H. 104 (1988), the trial court found that Bennette's affirmative act of deciding to report the information about the defendant to O'Neill and Shaps could reasonably be seen to have induced them to question and search the defendant. The trial court also found that a prior agreement existed between the school and the department. In support of this finding, the trial court noted that Bennette conceded that he would "report suspicious criminal activity to the school administrators when he could not take action himself." The trial court therefore concluded that O'Neill and Shaps were acting as agents of the police when they questioned and searched the defendant. Because O'Neill and Shaps were acting as agents of the police and failed to comply with the procedural safeguards required when the State interrogates and searches a defendant, the trial court granted the defendant's motion to suppress. This appeal followed.

The State contends that the trial court's ruling that school officials acted as agents of the police was contrary to the manifest weight of the evidence. Although the State concedes that there was an agreement that Bennette would inform school officials of suspicious behavior when he did not have probable cause to investigate, it asserts that there was no evidence that school officials agreed to act on behalf of the police or for their benefit as required by *Bruneau*, 131 N.H. at 109. The State also argues that the record contains no evidence that O'Neill and Shaps searched the defendant at Bennette's request. The State does not challenge the trial court's finding that, as agents of the police, the school officials failed to comply with the procedural safeguards required when the State interrogates and searches a criminal defendant. Therefore, the only issue before us is whether an agency relationship existed.

■ A warrantless search or seizure is presumptively illegal and the prosecution has the burden of establishing that it falls within a recognized exception to the warrant requirement. *See State v. Ricci*, 144 N.H. 241, 243 (1999). The acquisition of evidence by an individual acting as an agent of the police must be reviewed by the same constitutional standards that govern law enforcement officials. *See Skinner v. Railway Labor*

*Executives' Assn.*, 489 U.S. 602, 614 (1989). This "agency rule" prevents the police from having a private individual conduct a search or seizure that would be unlawful if performed by the police themselves. Because we uphold the trial court's suppression order under the State Constitution, we need not undertake a separate federal constitutional analysis and look to federal caselaw for guidance only. *See State v. Ball*, 124 N.H. 226, 233, 237 (1983).

■■ An agency relationship requires "proof of some affirmative action by a police officer or other governmental official that preceded the interrogation [of the defendant, which] can reasonably be seen to have induced the third party to conduct the interrogation that took place." *Bruneau*, 131 N.H. at 109. In *Bruneau*, we explained that two varieties of governmental action would qualify to prove the existence of an agency relationship. *See id.* First, an agreement between a private party and the government that the private party should act to obtain evidence from a defendant will suffice as affirmative action and inducement. *See id.* Such an agreement

> may merely authorize or sanction the third party's action, or it may take on the features of a private contract, with an agreed-upon *quid pro quo* for the third party's efforts or results. It may be expressed with precision on each side, or confirmed by a mere wink or nod.

*Id.* Whether formal or informal, the agreement must "evince an understanding that the third party will be acting on the government's behalf or for the government's benefit." *Id.* Second, prior governmental requests for help may be an affirmative action inducing a third party to act. *See id.* In both "varieties," the government will have acted in a way that may be understood to have formed an inducement for a third party to engage in obtaining evidence for the government's use or benefit. *See id.* at 110.

■ The fundamental concern of the agency rule is to curb unconstitutional activity by government; it is meant to prevent the government from circumventing the rights of a defendant by securing private parties to do what it cannot. Although the existence of an agreement or a request forms the crux of our agency analysis, *see State v. Gosselin*, 131 N.H. 243, 248 (1988), these two "varieties" of government action are not intended to narrow a trial court's consideration of all the factual circumstances surrounding an alleged agency relationship. Indeed, implicit in *Bruneau* and its progeny is an understanding that the totality of

the circumstances must be considered when determining whether the operative facts create an agency relationship. *See Bruneau,* 131 N.H. at 110; *Gosselin,* 131 N.H. at 248-49; *State v. Tinkham,* 143 N.H. 73, 77 (1998); *see also Skinner,* 489 U.S. at 614; *Coolidge v. New Hampshire,* 403 U.S. 443, 487 (1971).

A finding of agency relies upon the unique position of the fact-finder, who assesses first-hand all of the verbal and nonverbal aspects of the evidence presented. *Cf. State v. Ford,* 144 N.H. 57, 61 (1999) (determination of voluntariness in context of criminal confession relies on unique position of fact-finder). The determination of whether, based upon the underlying facts, an agency relationship exists requires the application of law, however, and we must therefore consider whether this part of the agency analysis calls for *de novo* review. *Cf. State v. Brunelle,* 145 N.H. 656, 658 (2000) (whether facts constitute a seizure is question of law which court reviews *de novo*). As the issue of whether an agency relationship exists is essentially fact-driven, *see Gosselin,* 131 N.H. at 247, a deferential standard of review is appropriate. *Cf. Ford,* 144 N.H. at 61 (voluntariness, although a mixed question of law and fact, is essentially fact-driven question reviewed deferentially). Therefore, whether or not we would have made a similar finding, we will uphold a trial court's finding of an agency relationship unless it is unsupported by the record or clearly erroneous. *See id.; Gosselin,* 131 N.H. at 247.

We begin by examining the scope of school officials' administrative duties. School officials are "responsible for administration and discipline within the school and must regularly conduct inquiries concerning both violations of school rules and violations of law." *Tinkham,* 143 N.H. at 77 (quotations and citations omitted). Their administrative duties, however, do not include enforcing the law or investigating criminal matters. *See id.* School officials are not law enforcement officers and they should not be charged with knowing the intricacies of constitutional criminal procedure. *See Drake,* 139 N.H. at 666.

Because they are not law enforcement officers, when school officials search for contraband in order to foster a safe and healthy educational environment, they are afforded greater flexibility than if a law enforcement officer performed the same search. *See id.* If school officials agree to take on the mantle of criminal investigation and enforcement, however, they assume an understanding of constitutional criminal law equal to that of a law enforcement officer. In such circumstances, even if school officials *claim* their actions fall within the ambit of their administrative authority, they should be charged with abiding by the

constitutional protections required in criminal investigations. *See, e.g., Tinkham*, 143 N.H. at 77 (school official acting as an instrument or agent of the police may be required to administer *Miranda* warnings). In sum, the role of school officials is to foster a safe and healthy educational environment. In order to do so, it is necessary that they be afforded some flexibility to swiftly resolve potential problems affecting this environment. However, enforcing the law or investigating criminal matters is outside the scope of a school official's administrative authority. *See id.*

The presence of law enforcement personnel within schools requires school officials to establish a working relationship with them. It is here that school officials should be vigilant not to assume responsibilities beyond the scope of their administrative authority. Constitutional rights, which remain intact as students pass through the schoolhouse door, *see Drake*, 139 N.H. at 664, must be protected against school officials who inadvertently assume the role of law enforcement. Examining the relationship between school officials and law enforcement personnel within the school is a fact-intensive inquiry. It is the trier of fact who is in the best position to untangle the actions of school officials and those of law enforcement to determine whether a student's constitutional rights have actually been violated.

 In this case, the trial court concluded

> that [Bennette's] decision to report the incident was an affirmative action that can reasonably be seen to have induced O'Neill and Shaps to interrogate and search the defendant. The evidence also supports a finding that there was a prior agreement between [the school] and the [department]. In fact, [Bennette] testified . . . to such prior agreement when he conceded that it was his job to report suspicious criminal activity to the school administrators when he could not take action himself.

The record supports the trial court's conclusion that a prior agreement existed between the department and school officials for purposes of establishing that an agency relationship existed. Bennette testified that he delegated the responsibility of investigating less serious, potential criminal matters — drug cases — to school officials, and O'Neill confirmed that this was a "fair" characterization of the arrangement between the school and the department. Thus, while Bennette was responsible for investigating more serious crimes, such as possession of a dangerous weapon, the school accepted responsibility for investigating less serious ones. Bennette also conceded that a "silent understanding" existed between him and school officials that passing information to the school when he could not act was a

technique used to gather evidence otherwise inaccessible to him due to constitutional restraints. The school, by "a mere wink or nod" or something more concrete, agreed to investigate certain potential criminal matters on the State's behalf or for its benefit. *See Bruneau*, 131 N.H. at 109.

Recognizing that the trier of fact is in the best position to assess the relationship between law enforcement and school officials under an agency analysis, we conclude that the record also supports the trial court's finding that Bennette's actions induced the school officials to conduct the interrogation and search of the defendant. Accordingly, we find no error with the trial court's order granting the defendant's motion to suppress.

*Affirmed.*

BROCK, C.J., and NADEAU and DALIANIS, JJ., concurred.