Lebanon District Court
No. 2000-443

THE STATE OF NEW HAMPSHIRE

v.

ADAM NEMSER

Argued: July 11, 2002
Opinion Issued: October 25, 2002

*Philip T. McLaughlin,* attorney general (*Ann M. Rice,* senior assistant attorney general, on the brief and orally), for the State.

*DesMeules, Olmstead & Ostler,* of Norwich, Vermont (*George H. Ostler* on the brief and orally), for the defendant.

NADEAU, J. The State appeals an order of the Lebanon District Court (*Cirone*, J.) granting defendant Adam Nemser's motion to suppress. We reverse and remand.

The record supports the following facts. The defendant, a Dartmouth College undergraduate, was charged with possession of marijuana. *See* RSA 318-B:2, I (1995). He moved to suppress, alleging that the entry and search of his room by Dartmouth Safety and Security (DSS) officers violated the Fourth and Fourteenth Amendments to the Federal Constitution, and Part I, Article 19 of the State Constitution. The defendant argued that the DSS officers are agents of the State, to whom the requirements of the Fourth and Fourteenth Amendments and Part I, Article 19 apply.

The trial court found:

> [T]he DSS officers (1) do not jointly train with the Hanover Police Department or other law enforcement officers or agencies, (2) do not take specific direction from public law enforcement officials, (3) were not, in the Nemser case, acting at the specific direction or behest of Hanover Police Officers, (4) were not trained or directed by the Hanover Police Department or any other public law enforcement agency in formulating their policy and protocols and, (5) that they were not supplied with any equipment or other accessories or information by the Hanover Police Department to either assist them in or lead them to the discovery of the items seized in the present case.

Nevertheless, the court found a sufficient relationship between DSS and the Hanover Police Department to apply constitutional restrictions to the search at issue, and granted the motion to suppress. The State appealed.

The defendant relies upon both the State and Federal Constitutions. We address his State Constitutional claim first, using federal cases merely to aid our analysis under the State Constitution. *See State v. Patch*, 142 N.H. 453, 456 (1997). "Because in this case State law provides at least as much protection as federal law, we need not make a separate federal analysis." *Id.* (citations omitted).

"[T]he protections against unreasonable searches and seizures apply only to State action." *Id.* at 457. Thus, evidence obtained by a private party may be admissible even if secured through "the most outrageous behavior by [the] private party." *State v. Carroll*, 138 N.H. 687, 691 (1994) (quotation and brackets omitted). Constitutional restrictions do apply,

however, to a seizure of evidence by a private party acting as an agent of law enforcement. *See State v. Heirtzler*, 147 N.H. 344, 348 (2001). "This 'agency rule' prevents the police from having a private individual conduct a search or seizure that would be unlawful if performed by the police themselves." *Id.* at 349.

The State argues that the trial court erred in finding that the DSS officers acted as agents of the State in seizing contraband from the defendant. Because the determination whether an agency relationship exists is fact-driven, we employ a deferential standard in reviewing the trial court's finding. *See id.* at 350. We will therefore "uphold a trial court's finding of an agency relationship unless it is unsupported by the record or clearly erroneous." *Id.*

■ A conclusion that an agency relationship existed requires proof of some affirmative action by a governmental official prior to the search that can reasonably be seen to have induced the search by the private party. *See id.* at 349. We noted in *State v. Bruneau*, 131 N.H. 104, 109 (1988), that two kinds of governmental action will meet this standard. The first is the government's prior agreement with a third party that the latter should act to obtain evidence from a defendant. *See id.* Whether the agreement is formal or informal, "there will be some responsive communication between the parties, and the exchange will evince an understanding that the third party will be acting on the government's behalf or for the government's benefit." *Id.* Second, a prior governmental request for help may have the same effect, even though the third party who acts upon it may make no reply back to the government but responds simply by taking the action that a government official has requested. *See id.*

The trial court found "no express agreement between the State and College," but rather an "implicit understanding." Specifically, the court found:

> The College's agents conduct private area searches of drugs, not necessarily in plain view or with consent, and seize contraband, hold it for however long DSS determines, and the State won't prosecute any such agents and won't object to securing a search warrant [to retrieve contraband in DSS's possession] to "legalize" the process by cloaking the search with judicial approval.

We conclude that the court's finding is clearly erroneous. *See Heirtzler*, 147 N.H. at 350.

Robert McEwen, college proctor and director of DSS, testified that it is against college policy for students to possess drugs. As of June 1995, the college's policy with regard to controlled substances encountered by DSS officers was to destroy drug paraphernalia and small quantities of contraband and to report to the Hanover Police Department the rare instances in which large quantities of drugs were discovered or DSS suspected drug trafficking. The question was occasionally raised, however, whether DSS officers, being private citizens, risked arrest if they took possession of contraband in the course of their duties.

Mr. McEwen expressed this concern to Nicholas Giaccone, Hanover Chief of Police, in a letter dated June 12, 1995. Chief Giaccone replied that he did not believe that DSS officers met any of the recognized exemptions to the law prohibiting possession of a controlled substance, but that, as a practical matter, he would not be inclined to charge a DSS officer coming into possession of such substances in the course of his or her duties.

Chief Giaccone testified that a meeting between college and governmental officials was held "to discuss the issue of controlled substances," but that no agreement or consensus on college policy was reached. Subsequently, the college sent Chief Giaccone a letter, dated April 8, 1996, detailing the policy it had instituted. Senior Associate Dean Daniel Nelson, on the other hand, testified that the policy the college wanted to implement was discussed at the meeting and that the "Hanover police said that that was agreeable to them, and ... this letter was confirming the ... sense of the meeting." Nevertheless, Dean Nelson stated that the policy was "our policy; it's not a policy dictated by Hanover police or by the county attorney, but it's a policy that we developed."

The policy, as found by the trial court, is that DSS officers initially decide, in their own discretion, whether any illegal substance they discover is a small or "personal use" quantity, which they will confiscate, or a large quantity, which they will not confiscate. When large quantities of drugs or evidence of drug trafficking is observed, DSS reports the matter to the Hanover Police Department. When a small quantity of contraband is seized,

> [it] is retained at the DSS Office for an indeterminate, variable length of time, solely in the discretion of college officials. Thereafter, at some point the Hanover Police Department is notified by DSS and the Hanover Police then seek the issuance of a Search Warrant because the college position mandates that a search warrant be presented by the police before the contraband is relinquished by the college security force.

Chief Giaccone testified that the policy outlined in the April 8 letter was not "particularly something that [he] was thrilled at," but that, as he told the county attorney, "this is what they came up with and this is what we're gonna have to live with." He also testified that he was not aware of any instance in which one of his officers directed a DSS officer to search for drugs or had prior knowledge that a DSS officer would find drugs.

We conclude that these facts do not support the existence of an agency relationship. We do not discern in them an inducement by the State to search on its behalf, but rather a grudging acceptance by the Hanover Police Department of the unilateral decisions of a private party over which it believed it had no control. "Mere knowledge of another's independent action[] does not produce vicarious responsibility absent some manifestation of consent and the ability to control." *United States v. Koenig*, 856 F.2d 843, 850 (7th Cir. 1988).

In addition, the facts do not "evince an understanding that the third party will be acting on the government's behalf or for the government's benefit." *Bruneau*, 131 N.H. at 109. Instead, the college acted for its own purposes in enforcing its own policy against drug possession by students. A number of federal courts have found such independent motivation to be a factor weighing against a finding of agency. *See, e.g., United States v. Pervaz*, 118 F.3d 1, 5-6 (1st Cir. 1997).

■ This case differs factually from *Heirtzler*, 147 N.H at 348, in which "there was an agreement that [a police officer] would inform school officials of suspicious behavior when he did not have probable cause to investigate." Here, DSS officers acted unilaterally and unaided by police in furtherance of the college's own interests. Accordingly, we conclude that the trial court's finding of an agency relationship is clearly erroneous.

*Reversed and remanded.*

BROCK, C.J., and DALIANIS and DUGGAN, JJ., concurred.