Strafford
No. 2002-287

# STATE OF NEW HAMPSHIRE

v.

# CHAD EVANS

Argued: November 6, 2003
Opinion Issued: December 30, 2003

*Peter W. Heed*, attorney general (*N. William Delker* and *Simon R. Brown*, senior assistant attorneys general, on the brief, and *Mr. Delker* orally) for the State.

*David M. Rothstein*, deputy chief appellate defender, of Concord, by brief and orally, for the defendant.

BROCK, C.J. The defendant, Chad Evans, was convicted of reckless second-degree murder, *see* RSA 630:1-b (1996), five counts of second-degree assault, *see* RSA 631:2 (1996), endangering the welfare of a minor, *see* RSA 639:3, I (1996), and simple assault, *see* RSA 631:2-a (1996), following the death of twenty-one-month-old Kassidy Bortner, the daughter of his girlfriend, Amanda Bortner. He appeals, arguing that: (1) the Superior Court (*T. Nadeau*, J.) erroneously gave the jury a false exculpatory statement instruction; (2) the evidence on the second-degree murder charge was insufficient because it failed to eliminate the conclusion that Kassidy's babysitter, Jeffrey Marshall, killed her; and (3) the court erroneously admitted various of Amanda's statements under the excited utterance exception to the hearsay rule. *See* N.H. R. Ev. 803(2). We affirm.

*I. Facts*

The jury could have found the following facts. Amanda and the defendant began dating in June 2000. A month later, she and Kassidy moved into the defendant's Rochester home. Shortly thereafter, bruises started appearing on Kassidy. These bruises were caused by the defendant.

At first, the defendant bruised Kassidy only occasionally by forcibly grabbing her face out of frustration because Kassidy became jealous when Amanda was affectionate towards him. As time went on, his frustration with Kassidy grew.

In the month before she died, the defendant grabbed Kassidy's face hard as often as twice a week. He called her names such as "little bitch" and "f---ing retard." As frequently as three times a week, the defendant disciplined Kassidy by picking her up by the armpits and roughly placing her in front of a wall or in a corner. Once, he grabbed her by the back of the neck and tossed her against a closet door, banging her head against the door. Another time, when Kassidy resisted, he picked her up by the

armpits and threw her on the bed. When Amanda intervened, he grabbed Kassidy's leg and then walked away, muttering that he wished Kassidy had never been born. On another occasion, to stop her from crying and screaming, the defendant pressed his finger on Kassidy's throat, hard enough to make her gag.

The defendant and Amanda made up false excuses to explain the obvious bruises on Kassidy's face, including that the defendant grabbed Kassidy's face to prevent her from falling off a trampoline. They also said that Kassidy was bruised because she was clumsy or because she accidentally bumped her head. Because of the bruises and her fear that Kassidy would be taken from her, Amanda refused to put Kassidy in day care. Instead, she asked her sister and her sister's boyfriend, Marshall, to baby-sit.

On November 8, 2000, the day before Kassidy died, Amanda dropped her off at her sister's and Marshall's home in Kittery, Maine, at around 1:30 or 2:30 p.m. When she dropped Kassidy off, Kassidy was fine, although a bit sleepy. She had a couple of scratches and a faded bruise on her face, but nothing more. Her behavior was normal. She spent the afternoon watching cartoons.

The defendant picked up Kassidy at around 5:00 p.m. Shortly thereafter, he called from his car to tell Marshall that "[t]he little bitch is acting weird again." He said that Kassidy was "kind of bobbin' around" in the car. An hour or so later, he again called Marshall and said that she fell on her face on the ground when he took her out of the car. Later that evening, the defendant called Marshall again and told him that while playing ball with his three-year-old son, Kassidy was hit by his son with a ball. During the conversation, the defendant became frantic, telling Marshall that Kassidy's eyes were in the back of her head, and yelling at her to wake up. He told Marshall that Kassidy was out cold. When Marshall suggested that the defendant take her to the hospital, the defendant said that she had "come out of it" and was fine.

The defendant also called Amanda to tell her about the incident. He told her that he did not want to baby-sit for Kassidy anymore because "[i]t seems like every time that I have her something happens where she hurts herself."

When Amanda came home that night, she and the defendant fought. At one point, the defendant grabbed her throat and pinned her against the couch, telling her to "cut it out .... you know what gets me going. You know what makes my temper."

The next morning, Amanda brought Kassidy to Marshall's house. Amanda lay Kassidy on a bed, looked at Kassidy's face, and then said to

her sister, "Look what he did. It looks like f----ing s---, doesn't it." Kassidy's face was badly bruised; the bruises around her forehead looked like finger marks.

Kassidy appeared sick and in pain. Marshall and Amanda's sister were concerned about her and put her to bed. When they tried to rouse her, Kassidy whimpered and pulled away from them. Amanda's sister went to work and Marshall stayed at home with Kassidy, letting her sleep. At around 9:30 that morning, the defendant called and asked how Kassidy was doing. The defendant then told Marshall that he had received a call from the State because "someone had seen Kassidy at his house acting weird." The defendant was quite angry, telling Marshall that Amanda and "the little bitch [are] going to have to get out of my house."

At around 12:30 p.m., Marshall went to the bedroom to check on Kassidy and saw that she was unconscious, her eyes were in the back of her head, and she was making a gargling noise. While on the phone with 911, he tried to resuscitate her, but could not. Kassidy was taken by ambulance to a Maine hospital and pronounced dead on arrival.

An autopsy revealed that Kassidy died at approximately 12:30 p.m. from multiple blunt-force injuries that had caused bleeding and swelling in her brain, bleeding in the optic nerve, and internal bleeding in her abdomen. The medical examiner estimated that before she died, Kassidy received eight to ten blows to the head and at least two blows to the abdomen from a blunt force, such as a fist or a foot. Kassidy's fatal head injuries were inflicted sometime within the twenty-four hours preceding her death.

In addition to her fatal injuries, Kassidy had numerous bruises and multiple fractures in various stages of healing. Most of the bruises were between eight and twelve hours old. None of the bruises on Kassidy's face was consistent with being hit by a ball.

On the night of Kassidy's death, the police interviewed Amanda, her sister, Marshall and the defendant. The defendant told the police the trampoline story to explain how he had once bruised Kassidy's face. He also told them that she would sometimes "throw herself in the corner or throw herself into the wall" or run and "slam right into" a corner. He stated that Kassidy was "clumsy" and constantly walked into things like his coffee table. That night, Amanda and the defendant spoke by telephone. Crying, Amanda told the defendant, "[Y]ou killed my baby; I know you did this; you wanted her dead."

## II. False Exculpatory Evidence Charge

The defendant assigns two errors to the court's false exculpatory statement instruction. First, he argues that such an instruction constitutes

an impermissible comment on the evidence. Second, he argues that even if the instruction is permissible, the court should have broadened it to include false exculpatory statements made by Marshall. We address each argument in turn.

■ The scope and wording of jury instructions is generally within the sound discretion of the trial court. *State v. Lamprey*, 149 N.H. 364, 366 (2003). We will not reverse unless the jury charge fails to cover fairly the legal issues in the case. *See id.* We do not review the challenged instructions in isolation; instead, we review them in the context of the entire charge and all of the evidence to determine whether the trial court adequately stated the relevant law. *State v. Newell*, 141 N.H. 199, 205 (1996). We interpret jury instructions as a reasonable juror would have understood them. *Lamprey*, 149 N.H. at 366.

*A. Comment on Evidence*

The challenged instruction was as follows:

> Evidence has been introduced regarding statements the defendant offered to explain certain bruising on Kassidy. If you find the defendant intentionally made statements tending to demonstrate his innocence, or to influence a witness, and that the statements are later discovered to be false, then you may consider whether the statements show a consciousness of guilt, and determine what significance, if any, to give to such evidence.

This instruction is similar to one which we approved in *State v. Fischer*, 143 N.H. 311, 318-20 (1999). In *Fischer*, we did not decide whether such an instruction constitutes improper comment on the evidence because this issue was not preserved for our review. *Id.* at 318. We now hold that where, as here, the instruction permits, but does not require, the jury to infer consciousness of guilt from false exculpatory statements, it is not an improper comment on the evidence. *See State v. Marti*, 143 N.H. 608, 616-17 (1999); *see also State v. Cassell*, 129 N.H. 22, 24 (1986). It is "merely a correct statement of law." *Marti*, 143 N.H. at 617.

Evidence that a defendant intentionally made an exculpatory statement that is later discovered to be false may constitute circumstantial evidence of consciousness of guilt. *See United States v. Ingram*, 600 F.2d 260, 262 (10th Cir. 1979). It is reasonable to infer consciousness of guilt from a defendant's false exculpatory statement because "an innocent person does not usually find it necessary to invent or fabricate an explanation or statement tending to establish [his or her] innocence." 1A K. O'MALLEY

& A., FEDERAL JURY PRACTICE AND INSTRUCTIONS—CRIMINAL § 14.06, at 286 (5th ed. 2000). Exculpatory statements later shown to be false are akin to other evidence that may be relevant to show consciousness of guilt, such as flight and efforts to avoid suspicion. *See State v. Steed*, 140 N.H. 153, 155-56 (1995); *cf. State v. Stott*, 149 N.H. 170, 173 (2003) (defendant's statements to police were "extremely probative of his consciousness of guilt").

■ False exculpatory statement instructions "have long been accepted by the courts." *United States v. McDougald*, 650 F.2d 532, 533 (4th Cir. 1981). To be proper, a false exculpatory statement instruction must explain that the inference of consciousness of guilt is permissive, not mandatory. *See State v. Orta*, 786 A.2d 504, 510 (Conn. App. Ct. 2001); *see also Com. v. Martinez*, 769 N.E.2d 273, 280 (Mass. 2002); *cf. Cassell*, 129 N.H. at 24. The instruction must also make clear that false exculpatory statements are not evidence of guilt, but are evidence of consciousness of guilt. *See Fischer*, 143 N.H. at 319. Further, there must be an evidentiary basis for the instruction. *See United States v. Hudson*, 717 F.2d 1211, 1215 (8th Cir. 1983). In this case, the defendant concedes that there was sufficient evidence for the State to argue adverse inferences from his false exculpatory explanations for Kassidy's bruises.

When viewed in the context of the entire jury charge, we hold that the instruction in this case was appropriate. In its general instructions, the court instructed the jury that if the jury thought that the judge had expressed an opinion about the facts of the case, it "must disregard that expression." The judge further informed the jury that it was the judge's job "in this and in all cases . . . to remain entirely neutral, and it's up to you, alone, and not up to me to decide the facts in this case." The court explained that it was the jury's job to "decide the credibility of the witnesses," which meant that it had "to decide whom to believe."

■ In its false exculpatory statement instruction, the court made clear that the jury had to decide whether the defendant "intentionally made statements tending to demonstrate his innocence, or to influence a witness" and whether these statements were later shown to be false. It was further up to the jury to consider whether these statements indicated consciousness of guilt and to determine the significance "if any" to give to them. The instruction left "exclusively to the jury the question as to whether false exculpatory statements, if made, indicate consciousness of guilt, or nothing at all." *Ingram*, 600 F.2d at 262. As such, it was proper. *See State v. Parker*, 142 N.H. 319, 324 (1997) (jury instructions are

appropriate when they accurately state law and allow jury to exercise its own judgment in evaluating conflicting evidence).

### B. False Exculpatory Statement Instruction Pertaining to Marshall

The defendant contends in the alternative that if the false exculpatory statement instruction was permissible, the trial court should have applied it to Marshall. We disagree.

We rejected a similar argument in *State v. Bruneau*, 131 N.H. 104, 116-18 (1988). In *Bruneau*, the defendant argued that one of his associates had killed the victim and that another of his associates was lying to cover for him. *Id.* at 106, 116. In support, defense counsel urged the jury to consider that the two associates had disappeared after speaking with police. *Id.* at 116. Defense counsel argued that the behavior of the two associates merited an instruction that the jury could conclude from their behavior that the two associates were conscious of their guilt. *Id.* at 116-17.

We held that the court's refusal to give this instruction was not error. *Id.* at 117-18; *cf. Com. v. Toney*, 433 N.E.2d 425, 432 (Mass. 1982) (judge need not bring to attention of jury defendant's own innocent explanation for alleged flight). The defendant's assertion that someone other than he was guilty was not a theory of defense upon which he was entitled to an instruction, but was a theory of the case. *Bruneau*, 131 N.H. at 117-18.

We conclude that, like the defendant in *Bruneau*, the defendant in this case was not entitled to an instruction elucidating his theory that Marshall was guilty. *Id.* at 118. This was not a theory of defense upon which he was entitled to an instruction. *Id.* at 117-18; *see State v. Ramos*, 149 N.H. 272, 274 (2003).

The defendant argues that instructing the jury that it could infer consciousness of guilt from Marshall's allegedly false statements was necessary to prevent unfairness. We assume, without deciding, that it may be appropriate in some instances for the jury to be instructed on the false exculpatory statements of others. *See United States v. Boekelman*, 594 F.2d 1238, 1241 (9th Cir. 1979). "Whether an instruction is necessary in a particular case ... is an issue reserved to the trial court's sound discretion." *Ramos*, 149 N.H. at 274. We review the denial of a proposed jury instruction in the context of the entire charge and all evidence presented at trial, reversing only if the instructions did not adequately state the relevant law. *State v. Blackstock*, 147 N.H. 791, 798 (2002).

■ The trial court's decision not to expand the false exculpatory statement instruction to include Marshall was a sustainable exercise of discretion. *See Ramos*, 149 N.H. at 274. In contrast to the evidence

concerning the defendant's false exculpatory statements, there was scant evidence that Marshall lied about Kassidy's injuries to demonstrate his innocence. The defendant points to Marshall's denial that he abused Kassidy on either November 8 or November 9. Such general denials, however, do not merit a false exculpatory statement instruction. *See McDougald*, 650 F.2d at 533.

The defendant also refers to a statement Marshall made to his girlfriend, while he was trying to resuscitate Kassidy, that Kassidy was "coming through" and that she was going to the hospital. From this statement, Marshall's girlfriend inferred that Kassidy was "alert, sitting up and watching television," when, in fact, she was already dead. Marshall's statement, even if false, did not tend to demonstrate his innocence and did not merit a false exculpatory statement instruction.

In his opening and closing remarks, defense counsel vigorously argued that Marshall was a liar and a killer:

> Folks, you are gonna have one of those rare opportunities, you are going to see the killer of Kassidy Bortner, and you're going to see Jeff Marshall. . . . [I]f you want to hear about lame excuses, you're gonna hear 'em from none other than the star witness for the [S]tate . . . Jeffrey Marshall. . . . He's not the most perfect babysitter. Well, not only is he not the most perfect babysitter, he is a killer.
>
> . . . .
>
> Folks, [Amanda] dropped [Kassidy] off in the morning on November 9th, alive, at Jeff Marshall's house. . . . At Jeff Marshall's house she was supposed to be cared for by Jeff Marshall. . . . And she wasn't cared for by Jeff Marshall. She was dealt with at the highest level of neglect, and she was beaten at that house. . . . I'm going to—I'm going to tell you, we don't know what exactly happened over at Jeff Marshall's house, but he wasn't straight with you. He wasn't straight with you at all. And you don't have to take that from me.
>
> . . . .
>
> Jeffrey Marshall is a liar. Jeffrey Marshall is protecting himself. Jeffrey Marshall is avoiding reality here, folks. . . . But, he's a liar for more than one reason, and he's covering up, and he's minimizing, and he's doing everything that a liar would do. . . . Why? . . . Because he's innocent? . . . No. . . . He had a dead baby. He had a dead baby in his house. And he knows why he had a

dead baby in his house. He knows why he did it. He inflicted her wounds, okay. . . .

The defendant thus had "ample opportunity to present his theory and the jury was free to consider it." *State v. Shannon*, 125 N.H. 653, 663 (1984).

The court's jury instructions included extensive information to help the jury evaluate witness credibility. For instance, the court outlined various factors for the jury to consider, including:

> Whether the witness appeared to be candid; whether the witness appeared worthy of belief; the appearance and demeanor of a witness; whether the witness had an interest in the outcome of the case; whether the witness had any reason for not telling the truth; whether what the witness said seemed reasonable or probable; whether what the witness said seemed unreasonable or inconsistent with other evidence in the case or with prior statements by the witness; and whether the witness had any friendship or animosity toward other people in the case.

Viewing the jury instructions as a whole, we cannot say that the jury was incapable of evaluating the defendant's theory of the case absent a false exculpatory statement instruction that pertained to Marshall. *See Bruneau*, 131 N.H. at 118.

*III. Sufficiency of the Evidence*

The defendant argues that the evidence was insufficient because the State failed to eliminate the rational conclusion that Marshall killed Kassidy. We disagree.

To prevail on his challenge to the sufficiency of the evidence, the defendant must prove that no rational trier of fact, viewing all of the evidence and all reasonable inferences from it in the light most favorable to the State, could have found guilt beyond a reasonable doubt. *See State v. Hull*, 149 N.H. 706, 712 (2003); *State v. Chapman*, 149 N.H. 753, 758 (2003). When the evidence is solely circumstantial, it must exclude all rational conclusions except guilt. *See State v. Duguay*, 142 N.H. 221, 225 (1997). Under this standard, however, we still consider the evidence in the light most favorable to the State and examine each evidentiary item in context, not in isolation. *See id.*

We conclude that a rational trier of fact, viewing the evidence and reasonable inferences from it in the light most favorable to the State, could have found beyond a reasonable doubt that the defendant, not Marshall, killed Kassidy.

The jury heard evidence that over a three-month period, the defendant hurt Kassidy repeatedly. He grabbed her face so hard that it bruised. He grabbed her by the neck and threw her against a closet door. He tried to stop her from crying by pressing his finger so hard against her throat that she gagged.

The jury heard evidence that the bruises were so frequent and so obvious that the defendant and Amanda felt obliged to fabricate stories, such as the trampoline story, to explain them. The bruises were so bad that Amanda did not want to take her daughter to day care because she was afraid that Kassidy would be taken from her.

The jury heard evidence that Kassidy's repeated injuries and the stories Amanda and the defendant made up to explain them were consistent with battered-child syndrome. As the expert explained:

> A battered-child syndrome is used to refer to a child in which there is repeated trauma inflicted upon them over a period of time. Usually, they present to a physician or the emergency room with some kind of an acute injury, often a head injury, and, upon examination, there are multiple other injuries present, sometimes other bruises, sometimes fractures or other injuries, and they are of varying ages, some older than others.
>
> . . . .
>
> [S]ome of the other characteristics are that usually the parent or caregiver, the[re] might be a delay . . . in the time in which they bring the child in for care. Secondly, usually the story that is told about how the injury occurs is inconsistent with the severity of the injury. There may be explanations that are just not plausible that are given by the caregiver for why or how the child has sustained multiple injuries.
>
> . . . .
>
> [O]ften we hear that these parents will say, well, there's a lot of bruises because the child just bruises easily; or if there is fractures, or other injuries, they might say that the child was just very clumsy and fell frequently.

The jury heard evidence from which a rational juror could have found, beyond a reasonable doubt, that the defendant inflicted Kassidy's fatal injuries on the night before she died. The jury heard that on the day before she died, Kassidy acted "[p]retty normal" and had only one fading bruise and a few scratches on her face. The jury heard that that night, something happened that rendered Kassidy unconscious. The defendant said that his son hit Kassidy in the head with a baseball. A later autopsy

revealed that none of the bruises on Kassidy's face was consistent with being hit by a ball.

The jury heard that the next day, Kassidy's face was very badly bruised and that Amanda blamed the defendant for the bruises, telling her sister, "Look what he did." The jury heard evidence that in his police interview, the defendant repeated the false stories he and Amanda made up to explain Kassidy's injuries, including the trampoline story. The jury also heard that on the night of Kassidy's death, Amanda accused the defendant of killing her, saying, "[Y]ou killed my baby; I know you did this; you wanted her dead."

The jury also heard medical evidence that most of Kassidy's recent bruises were inflicted when the defendant was taking care of her, approximately eight to twelve hours before she died. Her fatal injuries were inflicted sometime within the twenty-four hours before she died.

The defendant argues that the following evidence could have led a rational juror to conclude that he was not guilty: (1) when Kassidy died, she was in Marshall's care; (2) her pajama bottoms were removed and left on the bed the day that she died, although Marshall did not testify that he removed them and his girlfriend could not explain how they came to be removed; and (3) the medical evidence did not conclusively rule out Marshall as a cause of Kassidy's fatal injuries.

Viewing all of the evidence in the light most favorable to the State, we hold it was sufficient for the jury to exclude all rational conclusions except that the defendant was guilty.

## IV. Excited Utterance Exception

We briefly dispose of the argument in the defendant's *pro se* supplemental brief that the court erroneously admitted as excited utterances statements Amanda made to her friend on the night of his arrest. These statements included Amanda's comment to her friend, "And you knew, and I didn't listen." They also included Amanda's description of the defendant grabbing Kassidy by the shirt and pushing her into a corner when she cried.

To admit testimony under the excited utterance exception to the hearsay rule, the trial court must be satisfied that there was a sufficiently startling event or occurrence and the declarant's statements were a spontaneous reaction to the occurrence and not the result of reflective thought. *State v. Bonalumi*, 127 N.H. 485, 488 (1985); *see* N.H. R. Ev. 803(2). The evidence supports the trial court's finding that both of these prerequisites were satisfied.

■ During *voir dire*, the friend testified that on the night that the defendant was arrested, Amanda arrived at her house "hysterical" and crying. The friend lives approximately twenty minutes from the defendant's home, where Amanda and the defendant had been when he was arrested. The friend testified that Amanda was "very sporadic in her conversation . . .; disheveled; her hair was a mess; she was chain smoking; almost incoherent talking to me." The friend had never seen Amanda like that before. Throughout their conversation, Amanda cried and was "very emotional." The friend stated that it was "very hard to have a conversation with her that evening" because "[s]he was in a highly agitated, emotional state." The friend described it as "bits and pieces" rather than a conversation. Given this testimony, we hold that the trial court's decision to admit Amanda's statements as excited utterances was a sustainable exercise of discretion. *See Bonalumi*, 127 N.H. at 487-89.

We grant the State's motion to strike the remaining issues the defendant raises in his *pro se* supplemental brief because they were not raised in the notice of appeal and we did not grant him permission to brief them. *See State v. Thomas*, 150 N.H. 327, 332 (2003); Sup. Ct. R. 16(3)(b).

*Affirmed.*

DALIANIS and DUGGAN, JJ., concurred.