NOTICE: This opinion is subject to motions for rehearing under Rule 22 as well as formal revision before publication in the New Hampshire Reports. Readers are requested to notify the Reporter, Supreme Court of New Hampshire, One Charles Doe Drive, Concord, New Hampshire 03301, of any editorial errors in order that corrections may be made before the opinion goes to press. Errors may be reported by email at the following address: reporter@courts.state.nh.us. Opinions are available on the Internet by 9:00 a.m. on the morning of their release. The direct address of the court's home page is: https://www.courts.nh.gov/our-courts/supreme-court

THE SUPREME COURT OF NEW HAMPSHIRE

_____

Coos
No. 2019-0628

THE STATE OF NEW HAMPSHIRE

v.

ROGER DANA

Argued: November 16, 2021
Opinion Issued: March 10, 2022

John M. Formella, attorney general (Weston R. Sager, assistant attorney general, on the brief and orally), for the State.

Stephanie Hausman, deputy chief appellate defender, of Concord, on the brief and orally, for the defendant.

BASSETT, J. The defendant, Roger Dana, was convicted, following a jury trial in the Superior Court (Bornstein, J.), of first degree murder, see RSA 630:1-a, I(b)(1) (2016), for which he received a sentence of life without the possibility of parole. The defendant appeals his conviction, arguing that the trial court erred by admitting hearsay evidence, and by failing to give the false-exculpatory-statement jury instruction that the defendant requested. We affirm.

I. Facts

The jury could have found the following facts.  The defendant resided at an apartment in Berlin with his girlfriend and the victim, their two-and-a-half-year-old daughter.  On the night of November 26, 2016, all three slept at the apartment, along with the victim's grandfather and his fiancée.  On the morning of November 27, the victim's mother woke first.  She made the victim breakfast, changed the victim's diaper, and observed that the victim had no trouble eating and appeared uninjured.  At 7:45 a.m., the mother left the apartment to go to work, telling the defendant that she would return at 4:00 p.m.  The victim's grandfather and his fiancée were at the apartment until approximately 9:00 a.m., and saw that the victim appeared "normal" and did not have any bruising or bleeding.  After they left, the victim and the defendant were alone in the apartment.

Between 9:00 a.m. and 1:00 p.m., acquaintances of the defendant who were in or around the apartment saw the victim and observed that she appeared healthy and uninjured.  Later, at approximately 2:30 p.m., the defendant's next-door neighbor heard a "cluster of loud noises" coming from the apartment, including loud banging and the defendant's voice.  Approximately forty-five minutes later, the defendant called the victim's grandmother.  He told her that the victim had fallen off the bunk bed and had died.  The grandmother immediately called the victim's mother and relayed what the defendant had told her.  Both rushed to the apartment.

The grandmother arrived first.  When she entered the apartment, she saw the defendant sitting on his bed and holding the victim.  She observed that the victim was "all banged up and black and blue" and was not breathing.  The defendant was crying and upset, and appeared drunk.  He was not attempting to resuscitate the victim.  The victim's mother arrived soon afterward, grabbed the lifeless victim, and "tried to make [her] respond."  The victim's arms were limp, her eyes were glazed over, and she had cuts and bruises all over her body.

The victim's mother instructed the grandmother to call 911.  Meanwhile, the defendant "was just standing in the corner."  The defendant told the victim's mother and grandmother that he had given the victim a bath, put her on the top bunk of her bed, and that, while he was turned around looking for her clothes, she fell off the top bunk.  According to the defendant, he was alone with her when she fell.

At approximately 3:30 p.m., an officer arrived at the apartment.  He saw the victim's mother in the doorway, holding the lifeless victim and crying for help.  The defendant "was just standing there very quiet, not saying anything, not really doing anything," looking "nervous."  The victim had bruising on her

2

face and abdomen, no pulse, and cold skin, and she "looked like she had been beaten severely." Just as the officer was attempting CPR, paramedics arrived and placed the victim in an ambulance. As the mother and grandmother left for the hospital, the defendant asked where they were going. When the mother told him they were going to the hospital, the defendant said "whatever," and walked back into his bedroom.

At the hospital, the treating physician noted that the victim had bruising "everywhere, on her face, her ears, her chest, her back, her abdomen, her pelvic area." The back of the victim's head was so severely injured that it "felt like mush." Her eyes were "fixed and dilated," consistent with brain injury. The doctor opined that the victim's injuries were "[a]bsolutely not" consistent "with a fall off of a bed."

The victim was pronounced dead at 5:40 p.m. The medical examiner who performed the autopsy of the victim confirmed that the injuries were not consistent with a fall from a bunk bed because there were "way too many injuries on all surfaces of her body, all surfaces of her head." The examiner observed injuries around the victim's vagina, which she opined were caused by a "penetrating" small object, such as a finger. She also saw extensive injuries to the victim's anus and rectum, which she opined were caused by forced penetration, possibly by "a finger or fingers or a penis." The autopsy concluded that the victim's cause of death was "blunt-impact injuries of [the] head and abdomen."

The next day, November 28, officers from the State's Major Crimes Unit executed a search warrant at the apartment. There, they discovered blood on several surfaces and items throughout the apartment. They found the defendant's blood on a football jersey in his closet. The victim's blood was found on baby wipes in the trash and on her bed, and also on a child's pajama top that was wedged between the headboard of the defendant's bed and the wall.

The lead investigator interviewed the defendant twice: once in the early morning of November 28, and again on November 29. The defendant provided inconsistent accounts of the events leading up to the victim's death, sometimes saying that the victim fell off the top bunk, and other times saying that she fell off the bottom bunk. The defendant also met with the victim's mother. The defendant told the mother that he put the victim in the bottom bunk — rather than the top bunk, as he had previously told her — went back to his bedroom, and then heard a thud. He also told her that, after returning to the victim's room, he saw the victim on the floor. In all of these accounts, the defendant maintained that he was alone in the apartment with the victim when she was injured.

3

On December 2, the defendant was arrested, and he was later indicted for first degree murder.  See RSA 630:1-a, I(b)(1).  Following a jury trial, the defendant was convicted.  This appeal followed.

II. Analysis

The defendant argues that the trial court erred by admitting hearsay evidence, and by giving the jury an unduly narrow false-exculpatory-statement instruction.  We turn first to the defendant's argument that, on two occasions, the trial court erred when it admitted hearsay evidence.

A. The Grandmother's Statements

Hearsay is defined as "a statement that . . . the declarant does not make while testifying at the current trial or hearing," which "a party offers in evidence to prove the truth of the matter asserted in the statement."  N.H. R. Ev. 801(c).  Hearsay evidence is generally inadmissible, subject to certain well-delineated exceptions.  State v. Letendre, 161 N.H. 370, 372 (2011); N.H. R. Ev. 802.  "We accord the trial court considerable deference in determining the admissibility of evidence, and we will not disturb its decision absent an unsustainable exercise of discretion."  Letendre, 161 N.H. at 372 (quotation omitted).  To demonstrate an unsustainable exercise of discretion, the defendant must show that the trial court's ruling was clearly untenable or unreasonable to the prejudice of his case.  Id. at 372-73.

The defendant first argues that the trial court unsustainably exercised its discretion when it admitted the grandfather's fiancée's testimony about a phone call that she had with the grandmother.  The grandmother called the fiancée on November 28, approximately twenty-four hours after she learned of the victim's death.  The fiancée testified that the grandmother was "crying" and "very upset" when she called.  The grandmother "talked about the bruises [the victim] had on her body," and said that the defendant "murdered [the victim], beat her."  Over the defendant's hearsay objection, the trial court admitted the statements as excited utterances.[1]

The excited utterance exception to hearsay encompasses statements "relating to a startling event or condition, made while the declarant was under the stress of excitement that it caused."  N.H. R. Ev. 803(2).  The theory underlying the excited utterance exception is that "the circumstances under which the utterance was made afford a guarantee of truth in substitution for that provided by oath and cross-examination."  State v. Bonalumi, 127 N.H. 485, 487 (1985).  Therefore, the statement must be made "at a time when the speaker was still in a state of nervous excitement produced by [the startling]

---

[1] The defendant did not object to the statements on any other basis.  We note that the declarant, the grandmother, testified during the State's case-in-chief.

4

event, and before he had time to contrive or misrepresent." Id. (quotation omitted). "[T]o admit the testimony the trial judge must be satisfied that (1) there was a sufficiently startling event or occurrence, and (2) the declarant's statements were a spontaneous reaction to the occurrence or event and not the result of reflective thought." Id. at 488.

On appeal, the defendant argues that the trial court erred when it admitted the statements as excited utterances because: (1) the statements were made twenty-four hours after the victim's death; and (2) during the time between the victim's murder and the phone call, the grandmother engaged in "complex activities" requiring "relatively careful thought," which gave her "a chance to consider her own culpability." See State v. Woods, 130 N.H. 721, 726 (1988). The State counters that the trial court reasonably determined the statements to be excited utterances because: (1) the grandmother was crying and very upset during the phone call; (2) "the subject matter of her conversation with the fiancée — the murder of her granddaughter — was inherently distressing;" and (3) the grandmother "was continuing to suffer from the severe emotional trauma associated with" the victim's murder. The State also asserts that, even if the trial court erred in admitting the testimony, the error was harmless.

"The precise amount of time that may elapse before a statement loses its spontaneity as an excited utterance evoked by a startling event and becomes a mere narrative cannot be established by any absolute rule of law . . . . [A]ccordingly, much must be left to the discretion of the trial court in admitting or rejecting such testimony." State v. Pennock, 168 N.H. 294, 302-03 (2015) (quotation omitted). When deciding whether a statement is an excited utterance, the trial court must consider, in addition to the time elapsed, "all other circumstances surrounding the statements," including the nature of the exciting event and the declarant's state of mind. State v. Plummer, 117 N.H. 320, 325 (1977).

We find State v. Woods instructive. In State v. Woods, we considered whether a trial court erred when it admitted, as excited utterances, a child's statements to her mother about being assaulted the prior day. Woods, 130 N.H. at 723-24, 726. We held that the trial court erred when it admitted the statements because, even though there was evidence that the child was troubled by the decision to tell her mother about the assault, id. at 727, the day that elapsed had provided the child with "simply too much time for reflective thought," and there was insufficient proof that she "was laboring under such stress as to preclude a conscious statement," id. at 726-27.

Here, as was the case in Woods, the twenty-four-hour gap between the exciting event and the statements at issue extends well beyond the limits established by our excited utterance precedents. In addition, during the twenty-four hours between the victim's death and the phone call, the

grandmother "performed tasks requiring relatively careful thought," such as being interviewed by the police, giving the police her shirt for testing, and allowing the police to search her phone. 2 Robert P. Mosteller et al., McCormick on Evidence § 272, at 395 (8th ed. 2020). Such "[p]roof . . . provides strong evidence that," by the time of the phone call, "the effect of the exciting event had subsided." Id.; cf. State v. Fischer, 165 N.H. 706, 711 (2013) (noting the trial court's determination that "intervening events" precluded admitting hearsay under the excited utterance exception). Therefore, we hold it was an unsustainable exercise of discretion for the trial court to admit the grandmother's statements as excited utterances.

Although the testimony was admitted in error, we agree with the State that the error was harmless beyond a reasonable doubt.

> The harmless-error doctrine recognizes the principle that the central purpose of a criminal trial is to decide the factual question of the defendant's guilt or innocence, and promotes public respect for the criminal process by focusing on the underlying fairness of the trial rather than on the virtually inevitable presence of immaterial error.

State v. Edic, 169 N.H. 580, 588 (2017) (quotation omitted). To establish that an error was harmless, the State must prove beyond a reasonable doubt that the error did not affect the verdict. Id. An error may be harmless beyond a reasonable doubt if the other evidence of the defendant's guilt is of an overwhelming nature, quantity, or weight and if the improperly admitted evidence is merely cumulative or inconsequential in relation to the strength of the State's evidence of guilt. Id. at 588-89. In making this determination, we consider the other evidence presented at trial as well as the character of the erroneously admitted evidence itself. Id. at 589.

To convict the defendant of first degree murder, the State was required to prove that the defendant knowingly caused the victim's death "before, after, while engaged in the commission of, or while attempting to commit felonious sexual assault." RSA 630:1-a, I(b)(1). There was substantial physical evidence to establish that the victim was sexually assaulted, brutally beaten in the course of that assault, and died as a result of her injuries.

We conclude, based upon a review of the record, that the evidence that the defendant inflicted these injuries is of an overwhelming nature, and that the grandmother's statements were cumulative and inconsequential in relation to the strength of the other evidence of guilt. See Edic, 169 N.H at 588-89. The defendant, alone, had the opportunity to cause the victim's death, as he was alone in the apartment with her when she sustained her injuries. There was also evidence that the defendant, alone, expressed a motive to kill the victim. Approximately two weeks before the victim's murder, the defendant

said his life was like "jail" because "he couldn't leave the house hardly . . . and he had to be home all the time to watch [the victim]," and that "he might as well just go do something to go to jail if he's going to be treated like he's in jail." The other evidence also included the defendant's behavior after the victim was injured, such as his decision to call the victim's grandmother instead of the police; his failure to attempt to resuscitate her; his refusal to go with the victim to the hospital; and his nervous demeanor. In addition, there was evidence from which the jury could have inferred that the defendant was conscious of his guilt, including his inconsistent explanations for how the victim died, see State v. Evans, 150 N.H. 416, 420 (2003), and evidence that he hid the victim's blood-stained pajama top, see Edic, 169 N.H. at 590.

Given this evidence, the grandmother's statements were merely cumulative and inconsequential. Even if the challenged testimony had not been admitted, there was overwhelming evidence that the defendant killed the victim. See State v. Peters, 162 N.H. 30, 38 (2011). Accordingly, we conclude that the State has met its burden of proving that the error in admitting the grandmother's statements did not alter the verdict and was, therefore, harmless beyond a reasonable doubt. See Edic, 169 N.H. at 588-92.

### B. The Investigator's Statements

The defendant next argues that the trial court erred when, during the State's re-direct examination of the lead investigator, it admitted testimony about interviews the investigator conducted during the investigation. On direct examination, the State asked the investigator questions about his investigation, and on cross-examination, defense counsel attacked his investigation by establishing that the investigator did not swab the grandmother's hands or search her home, and that the investigator did not personally search her or three other individuals. On re-direct examination, the State inquired as follows:

Q  Defense counsel asked you about [four individuals]. Remember that?

A  Yes.

Q  Were the people they were with on November 27th interviewed?

A  Yes, they were.

Q  To account for their whereabouts?

A  Yes.

Defense counsel objected and moved to strike the investigator's responses, arguing that they were inadmissible hearsay. The court overruled the objection and admitted the testimony, reasoning that it was admissible non-hearsay because no statement had been elicited. The defendant argues on appeal that the testimony was hearsay and, therefore, inadmissible.

7

We do not reach the merits of the defendant's hearsay argument because we agree with the State that, even if the trial court erred when it admitted the investigator's statements, any error was harmless. As described above, the State presented overwhelming evidence of the defendant's guilt. The investigator's responses could arguably have informed the jury that non-testifying declarants had vouched for the whereabouts of the four named individuals. However, even if the investigator's responses did suggest to the jury that none of the four named individuals were at the apartment when the victim was injured, the defendant's repeated statements that he was alone with the victim in the apartment provided substantial evidence of that fact. See id. at 592. Because the challenged testimony was cumulative and inconsequential in relation to the strength of the State's evidence of guilt, we hold that the trial court's error, if any, was harmless. See id. at 588-89.

### C. False-Exculpatory-Statement Jury Instruction

We turn now to the defendant's third claim of error. The defendant argues that the trial court erred when it denied his request to broaden the false-exculpatory-statement jury instruction to encompass individuals other than the defendant.

At trial, the State requested that the court provide the jury with a false-exculpatory-statement instruction. Such instructions permit the jury to infer consciousness of guilt from evidence that the defendant had made a false statement in order to demonstrate his innocence. See Evans, 150 N.H. at 420. The defendant objected to the State's requested instruction, and proposed a different version of the false-exculpatory-statement instruction that would apply not only to him, but also to other witnesses — specifically, one of the defendant's friends and the grandmother. The court overruled the defendant's objection and gave the following instruction:

> [I]f you find that the [d]efendant intentionally made a statement or statements tending to demonstrate his innocence, and the statement or statements were later discovered to be false, then you may consider whether the statements show a consciousness of guilt and determine what significance, if any, to give to such evidence. It is your decision as jurors as to whether false exculpatory statements, if made, constituted or indicate consciousness of guilt or nothing at all.

On appeal, the defendant does not challenge whether giving a false-exculpatory-statement jury instruction was itself permissible; rather, he argues that the trial court erred when it failed to give his version of the instruction.

8

We have twice before rejected arguments similar to the defendant's argument in this case. See State v. Bruneau, 131 N.H. 104, 116-18 (1988); Evans, 150 N.H. at 422. In both Bruneau and Evans, we held that the defendants in those cases were not entitled to instructions about the false exculpatory statements of other witnesses because "a factual argument that tend[s] to indicate someone else [is] guilty" constitutes a "theory of the case," not a "theory of defense." Bruneau, 131 N.H. at 117, 118; Evans, 150 N.H. at 422. Whereas "[a] requested charge on a party's theory of defense must be given if such theory is supported by some evidence," State v. Aubert, 120 N.H. 634, 635 (1980) (emphasis added), whether to instruct the jury about the defendant's theory of the case "is an issue reserved to the trial court's sound discretion." Evans, 150 N.H. at 422.

The defendant acknowledges that his requested instruction pertained only to a theory of the case, not a theory of defense. However, he asks us to revisit Bruneau and its progeny and reject the distinction between theories of defense and theories of the case. We decline to do so. See id. (reaffirming the distinction between theories of defense and theories of the case).

"We assume, without deciding, that it may be appropriate in some instances for the jury to be instructed on the false exculpatory statements of others," id. at 422. However, like the defendant in Evans, the defendant here has not demonstrated that the trial court unsustainably exercised its discretion by failing to give the instruction. See id. at 422-24. Whether an instruction is necessary in a particular case is an issue reserved to the trial court's sound discretion. Id. at 422. "We review the denial of a proposed instruction in the context of the entire charge and all evidence presented at trial, reversing only if the instructions did not adequately state the relevant law." Id.

The trial court's decision not to expand the false-exculpatory-statement instruction was a sustainable exercise of discretion. All of the factors that supported our decision in Evans are present here. The defendant had "ample opportunity to present his theory and the jury was free to consider it." Id. at 424 (quotation omitted). The defendant's attorneys vigorously argued in their opening and closing remarks that either the grandmother or the defendant's friend murdered the victim and, during trial, defense counsel had the opportunity to cross-examine both individuals. Additionally, as in Evans, the court's other jury instructions included "extensive information to help the jury evaluate witness credibility." Id. Indeed, the jury in this case was given an instruction — the same instruction that the jury in Evans was given — that outlined "various factors for the jury to consider" when evaluating witness credibility. Id. Therefore, viewing the jury instructions as a whole, we cannot conclude that the jury was incapable of evaluating the defendant's theory of the case absent a false-exculpatory-statement instruction that pertained to individuals other than him. See id.

9

III. Conclusion

For the foregoing reasons, we affirm the defendant's conviction for first degree murder. Any issues that the defendant raised in his notice of appeal, but did not brief, are deemed waived. State v. Scott, 167 N.H. 634, 643 (2015).

Affirmed.

HICKS, HANTZ MARCONI, and DONOVAN, JJ., concurred.